# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

**FILED**

JUL 1 2 2019

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

231 Williams Street,
Fayetteville, North Carolina 28301

)
)
)
)
)

Case No. 5:19-mj-1838-J6

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment E, incorporated herein by reference.

located in the _____ Eastern _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment Q, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2342(a), 371 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1956(h) | cigarette trafficking, conspiracy to commit cigarette trafficking, money laundering, and conspiracy to commit money laundering |

The application is based on these facts:
See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan T. Moultis, SA    David F. Borresen, Senior Sargent
*Printed name and title*

On this day, Bryan T. Moultis & David F. Borresen appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Application for a Search Warrant.

Date: 12 July 2019

_____
*Judge's signature*

JAMES E. GATES, United States Magistrate Judge
*Printed name and title*

City and state: Raleigh, North Carolina

sk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| SEARCH OF: | ) | |
| | ) | CASE No._____ |
| 109 Ashton Place | ) | |
| Spring Lake, North Carolina 28390 | ) | |
| 123 N Main Street | ) | |
| Spring Lake, North Carolina 28390 | ) | |
| 165 W Manchester Rd. Unit 14-17 | ) | |
| Spring Lake, North Carolina 28390 | ) | |
| 1111 N. Bragg Blvd, Suite 90 | ) | |
| Spring Lake, North Carolina 28390 | ) | |
| 231 Williams Street | ) | |
| Fayetteville, North Carolina 28301 | ) | |
| 3005 Lambrusco Place | ) | |
| Fayetteville, North Carolina 28306 | ) | |
| 3605 Heather Brook Drive | ) | |
| Fayetteville, North Carolina 28306 | ) | |
| 4207 Cinder Lane | ) | |
| Fayetteville, North Carolina 28312 | ) | |
| 3124 B Turtle Point Drive | ) | |
| Fayetteville, North Carolina 28304 | ) | |
| 46 Alyssa Court | ) | |
| Lumberton, North Carolina 28360 | ) | |
| 4811 Pinedale Blvd | ) | |
| Lumberton, North Carolina 28358 | ) | |
| 2306 E. Elizabethtown Rd | ) | |
| Lumberton, North Carolina 28358 | ) | |
| 39 White Oak Drive | ) | |
| Smithfield, North Carolina 27577 | ) | |
| 1041 Highway 701 S | ) | |
| Four Oaks, North Carolina 27524 | ) | |
| | | |
| IN THE MATTER OF THE | ) | |
| SEIZURE OF: | ) | |
| | ) | |
| CresCom Bank account number 4300325101 | ) | |
| Capital Bank account number 802152645 | ) | |

1

Sk

# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS AND SEIZURE WARRANTS

We, Bryan T. Moultis and David F. Borresen (hereinafter "affiants"), being first duly sworn, do hereby affirm and state the following:

## Bryan T. Moultis

1. I, Bryan T. Moultis, am a Special Agent (S/A) of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed over seven (7) years as a HSI S/A and have completed the DHS Federal Law Enforcement Training Center (FLETC), Criminal Investigator Training Program (CITP). I am currently assigned to the HSI Resident Agent in Charge Raleigh, North Carolina Field Office (HSI RAC/RA) and my duties include conducting criminal investigations for violations of Titles 8, 18, 19 and 21 of the United States Code, to include violations of immigration offenses, in conjunction with the Document Benefit Fraud Task Force ("DBFTF"), which investigates the manufacture and sale of fraudulent Form I-551 Immigration and Naturalization Resident Alien Cards, commonly known as green cards, as well as the fraudulent procurement of immigration benefits, such as permanent residence in the United States. Prior to my appointment as a HSI S/A, I was employed as civilian S/A with the Army Criminal Investigation Command, Major Procurement Fraud Unit, for a period of two years, where I performed sophisticated fraud and corruption investigations. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

## David F. Borresen

2. I, David F. Borresen have been a Law Enforcement Officer since September 1999. From July of 2008 until August 2010, I was assigned to the Cumberland County Bureau of Narcotics (CCBN). The Cumberland County Bureau of Narcotics Unit targets and investigates violations of the North Carolina Controlled Substances Act. I have had experience in the investigations of controlled substances in the past as a uniformed officer prior to being assigned to the Cumberland County Bureau of Narcotics. During that time period I have become familiar with the persons, practices and customs of those dealing in the sale and distribution of controlled substances in the Cumberland County area. In addition to Basic Law Enforcement Training, I have received instruction from other officers, from this and other agencies in the field of investigations, detection, identification and undercover purchasing of illegal controlled substances. In addition, based on my training and experience, I am familiar with the packaging for sale, methods of sale, and the actual

2

SK

sale of illegal controlled substances. Since December of 2014 I have been assigned to the Cumberland County Organized Crime Unit (CCOCU) where I investigate organizations and criminal enterprises involved in illegal substantive offenses, including money laundering offenses. I have been involved in a substantial number of organized crime cases, and I have received significant training in the law and operation of illegal organized criminal operations of criminal groups, units, or enterprises. I also have a Bachelor's of Science with a concentration in Criminal Justice from Campbell University.

3.     Based upon my work experience, I know that business records are created in the normal operation of a business. Business records are vital to the day-to-day operation, obtaining financing, and for the preparation of tax returns, and purchase of other assets.

4.     As a detective investigating organized crime, I have received training in the investigation of criminal violations of currency transaction offenses in violation of the Bank Secrecy Act, and the laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957. I have attended the Bank Secrecy Conference annually for the past 4 years in which, I have attended various specialized training seminars on money laundering and related financial crimes. This training has specifically covered the means and techniques, by which individuals engaged in criminal activities derive, launder, conceal and spend their illegal profits, and their use of assets to facilitate their unlawful activity. My training has also included means and techniques used by individuals to evade reporting and paying income tax, including the use of nominees and misclassification of personal expenses as business expenses.

5.     Based on my training and experience, I know that individuals involved in money laundering activities and other financial crimes often willfully and knowingly misclassify, mislabel, or omit financial transactions and accounts from required reporting. I know that in order for criminals to conceal and hide sources of taxable income, the books and records of the business are sometimes falsified.

6.     I understand that individuals involved in financial crimes often deposit all or portions of criminal proceeds into personal or business bank accounts, or bank accounts in the names of accomplices (or nominees), and oftentimes use several accounts in various financial institutions, inside and outside the United States, thereby concealing the nature, source, and ownership of the proceeds making the proceeds more difficult to identify. I also know that monetary instruments, such as money orders and cashier's checks, utilized by individuals engaged in criminal financial schemes, are often secured in safe-deposit and lock boxes.

3

Sk

7.     Also, I know that individuals involved in financial crimes and other illegal activities often place income and assets in the name of nominees in hopes of shifting their responsibility for the payment of tax and concealing their ownership to protect the assets from seizure.  However, such individuals often still maintain the titles and deeds to said assets, rather than the nominee owner.

8.     I also understand that individuals involved in financial crimes and other illegal activities often seek to conceal or disguise the nature, location, source, ownership, or control of property through a number of means, including wire transfers of funds using financial service companies, such as traditional banks, money transfer companies (e.g., Western Union Company, MoneyGram International Inc.), and virtual currency exchanges, as well as trade-based money laundering that often involve the trading of commodity and products.

9.     I know from experience, and consulting with other law enforcement, that to accurately reconstruct financial histories, all forms of business and personal records reflective of financial transactions are required.

10.     I am also aware that individuals engaged in conspiracies to commit financial and related crimes often communicate with one another as well as with unwitting accomplices. I know these communications can occur in many forms, including person-to-person, telephonic and electronic such as email.   These communications typically involve details pertaining to the scheme, directions to subordinates as to how to carry out certain elements of the scheme and correspondence to and from unwitting third parties such as financial institutions and accountants.

11.     I know that individuals involved in criminal endeavors conduct financial transactions in a manner to avoid law enforcement detection.  Based upon my training and experience, and consultation with other law enforcement, I know that persons involved in financial crimes oftentimes exchange currency for various types of monetary instruments, and thereby attempt to disguise and conceal their true business and personal affairs. Based on my training and experience, I know that individuals will deposit all or portions of corporate proceeds into personal bank accounts, or bank accounts in the names of accomplices (or, nominees), thereby I also know that monetary instruments, such as money orders and cashier's checks, utilized by individuals engaged in schemes to evade taxes, are often secured in safe-deposit and lock boxes.

12.     Also based on my training and experience, I know that individuals involved in drug trafficking, gambling and other illegal activities often place income and assets in the name of nominees in hopes of shifting their responsibility for the

4

Sk

payment of tax and concealing their ownership to protect the assets from seizure. However, such individuals often still maintain the titles and deeds to said assets, rather than the nominee owner.

13.    I am experienced in analyzing business and personal financial records created and maintained by legal and illegal business entities. Such analysis determines the validity of the books and records and provides leads to unreported income and non-deductible expenditures.

14.    I know that individuals involved in criminal endeavors conduct financial transactions in a manner to avoid law enforcement detection. Based upon my training, I know that persons involved in tax and other financial crimes exchange currency for various types of monetary instruments, including postal money orders and bank cashiers' checks, and thereby attempt to disguise and conceal their true business and personal affairs.

## INTRODUCTION

15.    This affidavit is made in support of applications for warrants to search the entire premises located at the following locations (hereinafter collectively "SUBJECT LOCATIONS"):

a. 109 Ashton Place, Spring Lake, North Carolina 28390, (hereinafter "SUBJECT PREMISES A"), located within the Eastern District of North Carolina. SUBJECT PREMISES A is more particularly described in Attachment A of this affidavit;

b. 123 N. Main Street, Spring Lake, North Carolina 28390, (hereinafter "SUBJECT PREMISES B"). SUBJECT PREMISES B is more particularly described in Attachment B of this affidavit;

c. 165 W. Manchester Road, Unit 14-17, Spring Lake, North Carolina 28390, (hereinafter "SUBJECT PREMISES C"). SUBJECT PREMISES C is more particularly described in Attachment C of this affidavit;

d. 1111 N. Bragg Blvd, Suite 90, Spring Lake, North Carolina 28390, (hereinafter "SUBJECT PREMISES D"). SUBJECT PREMISES D is more particularly described in Attachment D of this affidavit;

e. 231 Williams Street, Fayetteville, North Carolina 28301, (hereinafter "SUBJECT PREMISES E"). SUBJECT PREMISES E is more particularly described in Attachment E of this affidavit;

f. 3005 Lambrusco Place, Fayetteville, North Carolina 28306, (hereinafter "SUBJECT PREMISES F"). SUBJECT PREMISES F is more particularly described in Attachment F of this affidavit;

g. 3605 Heather Brook Drive, Fayetteville, North Carolina 28306,

Sk

(hereinafter "SUBJECT PREMISES G"). SUBJECT PREMISES G is more particularly described in Attachment G of this affidavit;

h. 4207 Cinder Lane, Fayetteville, North Carolina 28312, (hereinafter "SUBJECT PREMISES H"). SUBJECT PREMISES H is more particularly described in Attachment H of this affidavit;

i. 3124 B Turtle Point Drive, Fayetteville, North Carolina 28304 (hereinafter "SUBJECT PREMISES I"). SUBJECT PREMISES I is more particularly described in Attachment I of this affidavit;

j. 46 Alyssa Court, Lumberton, North Carolina 28360, (hereinafter "SUBJECT PREMISES J"). SUBJECT PREMISES J is more particularly described in Attachment J of this affidavit;

k. 4811 Pinedale Blvd, Lumberton, North Carolina 28358, (hereinafter "SUBJECT PREMISES K"). SUBJECT PREMISES K is more particularly described in Attachment K of this affidavit;

l. 2306 E. Elizabethtown Road, Lumberton, North Carolina 28358, (hereinafter "SUBJECT PREMISES L"). SUBJECT PREMISES L is more particularly described in Attachment L of this affidavit;

m. 39 White Oak Drive, Smithfield, North Carolina 27577, (hereinafter "SUBJECT PREMISES M"). SUBJECT PREMISES M is more particularly described in Attachment M of this affidavit; and

n. 1041 Highway 701 S, Four Oaks, North Carolina 27524 (hereinafter "SUBJECT PREMISES N"). SUBJECT PREMISES N is more particularly described in Attachment N of this affidavit.

16. This affidavit seeks to search for and seize items or information from the SUBJECT LOCATIONS which will lead to evidence of violations of 18 U.S.C. §§ 2342(a) (cigarette trafficking), 371 (conspiracy to commit cigarette trafficking), § 1956(a)(1)(A)(i) (money laundering), 1956(a)(1)(B)(i) (money laundering), and 1956(h) (conspiracy to commit money laundering) (hereinafter "SUBJECT OFFENSES").

17. 18 U.S.C. § 2342(a) makes it unlawful to knowingly ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes. Contraband cigarettes are defined, with limited exceptions not applicable here, as a quantity in excess of 10,000 cigarettes (typically equivalent to 500 packs or 50 cartons), which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp. Trafficking in contraband cigarettes constitutes "Specified Unlawful Activity" as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1). 18 U.S.C. §§ 1956 and 1957 make it unlawful to engage in certain financial transactions involving proceeds of specified unlawful activities, including transactions intended to promote the carrying on of specified unlawful activity, as well as transactions

designed to conceal or disguise the nature, location, source, ownership or control of the proceeds.

18. In summary, this affidavit will show that JUSTIN BRENT FREEMAN, (hereinafter "DEFENDANT #1") FREECO, INC. (hereinafter "DEFENDANT #2"), MALEK HAMOUD ALSAIDI (hereinafter "DEFENDANT #3"), IBRAHIM AHMED ALSAIDI (hereinafter "DEFENDANT #4"), SADEK DAHAN SHAHBAIN (hereinafter "DEFENDANT #5"), AYED YAHYA ALI ALSHAMI (hereinafter "DEFENDANT #6"), ALSHAMI YAHYA ALI ALSHAMI (hereinafter "DEFENDANT #7"), MOHAMED HAFED ABDOU (hereinafter "DEFENDANT #8"), MOHAMED E. OULD EL BECHIR (hereinafter "DEFENDANT #9"), AKRAM ALI AMER (hereinafter "DEFENDANT #10"), MOHAMED YESLEM OULD IZID BIH (hereinafter "DEFENDANT #11"), MOHAMMED SAAID DARWEESH (hereinafter "DEFENDANT #12"), EL HASSEN HAMADI, (hereinafter "DEFENDANT #13"), MUSHEER MOHAMMED HAZAM AL-NAQEB (hereinafter "DEFENDANT #14"), ALI MOHAMMED MASHLI AL QADHI (hereinafter "DEFENDANT #15"), MOHAMED MOUNIR (hereinafter "DEFENDANT #16"), AIED AWAD SHIBLI (hereinafter "DEFENDANT #17"), SHIBLI ABU ISSA SHIBLI (hereinafter "DEFENDANT #18"), MANAR MOHAMMAD TALAL-MUSTAFA (hereinafter "DEFENDANT #19"), MOHAMMED N. M. KHALAYFA (hereinafter "DEFENDANT #20"), SALEH MOHAMMAD ABDELJAWAD (hereinafter "DEFENDANT #21"), KAID M. K. ADDAILAM (hereinafter DEFENDANT #22"), AMR MOUSA (hereinafter "DEFENDANT #23"), ALHALEMI, AHMAD KHALAYFA (hereinafter "DEFENDANT #24"), RAWHI ABDEL JABBAR KHAMS AWAD (hereinafter "DEFENDANT #25"), ALI AIED SHIBLI (hereinafter "DEFENDANT #26"), AMCHAD RAWHI KHAMIS AWAD (hereinafter "DEFENDANT #27"), WACHDI AWAD (hereinafter "DEFENDANT #28"), ABDALLAHI MOHAMED ELHAFEDH (hereinafter "DEFENDANT #29"), AHMED ELHOUSSEIN (hereinafter "DEFENDANT #30"), DEDDE CHEIKH (hereinafter "DEFENDANT #31"), and ARAFAT A. I. ABUHAMMOUD (hereinafter "DEFENDANT #32") (hereinafter collectively "DEFENDANTS") conspired to commit the SUBJECT OFFENSES and profited from the illicit trade in large quantities of cigarettes, purchased with cash in North Carolina, and driven to the northeast and distributed without payment of applicable state taxes.[1]

19. This affidavit is also made in support of a criminal and civil seizure warrant pursuant to 18 U.S.C. §§ 981(b) and 21 U.S.C. 853(f), to seize the funds and assets described below (hereinafter collectively "SUBJECT ACCOUNTS") that are subject to forfeiture to the United States as property representing the proceeds of contraband cigarette trafficking and/or property involved in violations of 18 U.S.C. §§

---

[1] The defendants have been numbered for identification purposes consistent with the case numbers assigned in the Indictment.

Sk

1956 and 1957 (money laundering), or property traceable to such property:

a.  The balance of all funds held in CresCom Bank account number 4300325101 in the name of DEFENDANT #2 (hereinafter "SUBJECT ACCOUNT 5101"), more particularly described in Attachment O; and
b.  The balance of all funds held in Capital Bank account number 802152645 in the name of DEFENDANT #2 (hereinafter "SUBJECT ACCOUNT 2645"), more particularly described in Attachment P.

20.    Because this affidavit is being submitted for the purpose of securing warrants to search the SUBJECT LOCATIONS, your affiants have not included every fact known to them concerning this investigation. Instead, your affiants have set forth only those facts necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of SUBJECT OFFENSES will be located at the SUBJECT LOCATIONS. More specifically, your affiants seek authorization to locate the items described in Attachment S and to seize those items as evidence, fruits, and instrumentalities of the SUBJECT OFFENSES.

21.    Additionally, because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a seizure warrants for the SUBJECT ACOUNTS, it does not include all of the facts that have been learned during the course of this investigation.

22.    The facts contained in this affidavit come from your affiants' knowledge, either personal or collective, involvement in this investigation, information obtained from others involved in this investigation, and a review of the records and documents obtained during the course of this investigation. For simplicity purposes, this affidavit refers to your affiants in the plural form, although some events were personally witnessed by one of the co-affiants who shared the information with the other co-affiant during the course of the investigation.

### BACKGROUND ON CIGARETTE REGULATIONS AND LOSS CALCULATIONS

23.    The regulatory restrictions on distribution of tobacco products permits the federal government to impose an excise tax on manufacturers of cigarettes, state governments to impose their own excise tax on the wholesalers of cigarettes, and retailers to collect sales tax. The interstate shipment of tobacco products is regulated by federal law. New York, a state involved in the investigation requires that each pack of cigarettes sold at the retail level have a tax stamp affixed thereto evidencing the fact that they have been subject to that state's revenue authority. North Carolina

8

Sk

does not have a stamp requirement. Generally, the stamps are purchased and issuance of such tax "stamps" is also closely regulated.

24. The State excise taxes in North Carolina from 2018-2019 were $4.50 per carton. State excise taxes in New York from 2018-2019 were $43.50 per carton. New York City excise taxes were $15 per carton, for a total 58.20 per carton combining New York State and City taxes. Thus, during the relevant time period, the differential between the cost of a carton of cigarettes in North Carolina and the cost of the same carton in the northeast rose as high as $54 per carton ($58.50 minus $4.50). The investigation has revealed an estimated 213,000 cartons of illegally trafficked cigarettes and $12,322,943 in illegal gross proceeds attributable to the DEFENDANTS.

## RELEVANT BACKGROUND OF ENTITIES, INDIVIDUALS, AND ACCOUNTS

### Entities

25. DEFENDANT #2 was created on July 24, 2009 when DEFENDANT #1 registered Articles of Incorporation with the North Carolina Secretary of State. On February 10, 2011, DEFENDANT #1 opened a business checking account in the name of DEFENDANT #2, and listed DEFENDANT #1 as the owner. DEFENDANT #1 listed the principal business address of the company as SUBJECT PREMISES E. DEFENDANT #2 is in the business of supplying wholesale cigarette sales to individuals involved in cigarette trafficking. DEFENDANT #2 knowingly structured cigarette sales to conceal true buyers and the purpose of the transactions. DEFENDANT #1 and DEFENDANT #2 created an invoicing system that credited purchases of cigarettes to a variety of stores when actually other members of the conspiracy traveled to DEFENDANT #2 and purchased cigarettes for interstate transportation without the payment of applicable state taxes. From October 2018 through the date of this application, DEFENDANT #1 and DEFENDANT #2 have engaged in this activity.

26. Al-Talal Holdings, Inc. was created on November 22, 2016 when DEFENDANT #19 registered Articles of Incorporation with the North Carolina Secretary of State. DEFENDANT #19 was listed as the registered agent and represented the primary address of the business as SUBJECT PREMISES J. Al-Talal Holdings, Inc. operates a business doing business as Smokeville Outlet in Lumberton, North Carolina. Smokeville Outlet is used as a business to purchase and consolidate cigarettes for interstate transportation.

9

SK

<u>Individuals</u>

27.    DEFENDANT #1 was born and raised in Cumberland County, North Carolina.  DEFENDANT #1 is the owner of DEFENDANT #2 since July 24, 2009. DEFENDANT #1 has signature authority on SUBJECT ACCOUNT 2645 and SUBJECT ACCOUNT 5101.

28.    DEFENDANT #19 is the owner of Al-Talal Holdings, Inc. which he created on November 22, 2016, when he incorporated the company with the North Carolina Secretary of State.  DEFENDANT #19 is an organizer and buyer of cigarettes in the criminal investigation.

<u>Financial Accounts</u>

29.    On or about February 10, 2011, DEFENDANT #1 and DEFENDANT #2 opened SUBJECT ACCOUNT 2645. DEFENDANT #1 signed as the owner and authorized signer of SUBJECT ACCOUNT 2645 at Capital Bank. The signature card was addressed to DEFENDANT #2 at SUBJECT PREMISES E. DEFENDANT #1 has continued to receive monthly statements relating to SUBJECT ACCOUNT 2645.

30.    On or about March 14, 2019, DEFENDANT #1 and DEFENDANT #2 opened SUBJECT ACCOUNT 5101. DEFENDANT #1 signed as owner and authorized signer on the SUBJECT ACCOUNT 5101 at CresCom Bank. The Corporate Authorization Resolution was addressed to DEFENDANT #2 at SUBJECT PREMISES E. DEFENDANT #1 and DEFENDANT #2 have continued to receive monthly statements relating to SUBJECT ACCOUNT 5101.

**INVESTIGATION**

31.    Since the early Fall of 2018, Homeland Security Investigations (HSI) in conjunction with the Cumberland County Sheriff's Office (CCSO) Organized Crime Unit (OCU) has been investigating cigarette trafficking activities committed in the Eastern District of North Carolina. As a result of the investigation, on June 19, 2019, a grand jury sitting in the Eastern District of North Carolina returned an indictment against the DEFENDANTS, charging them with the SUBJECT OFFENSES. <u>See</u> <u>United States v. Freeman et al.</u>, 5:19-CR-258-BO (under seal).  The Indictment is incorporated by reference as if fully set forth herein.

32.    Your affiants have utilized a series of confidential sources during the course of the investigation. Your affiants were contacted by confidential source of information (hereinafter "CSI #1") who alerted your affiants that DEFENDANT #1 and DEFENDANT #2 were involved in supplying cigarettes to a smuggling ring.

10

Sk

Your affiants learned through investigation that DEFENDANT #1 and DEFENDANT #2 is a wholesale grocery supplier located at SUBJECT PREMISES E that specialized in selling cigarettes and grocery items to small area stores. Your affiants additionally learned that CCSO OCU had investigated DEFENDANT #1 in the past for illegal gambling.

33.    Your affiants developed a second confidential source of information (hereinafter "CSI #2") who had direct knowledge and access to DEFENDANT #1 and DEFENDANT #2's business dealings and inside knowledge. CSI #2, who is known to your affiants, has provided credible and reliable information regarding the purchases as well as information regarding DEFENDANT #6, DEFENDANT #7, DEFENDANT #8, DEFENDANT #11, DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #26, DEFENDANT #27, and DEFENDANT #28 purchasing cigarettes under false business names, information, and documents. Your affiants have received from CSI #2 photos of documents such as bills of sales and internal inventory tracking reports from DEFENDANT #1 and DEFENDANT #2, which corroborate much of the information provided by CSI #2.

34.    Over the past year, your affiants have observed and documented the smuggling organization's methods and means of operation and have identified a variety of vehicles used by the DEFENDANTS and the organization in order to transport the contraband cigarettes to the SUBJECT LOCATIONS identified in this affidavit to further the commission of the SUBJECT OFFENSES. The group utilized DEFENDANT #8, DEFENDANT #9, DEFENDANT #12, DEFENDANT #13, DEFENDANT #16, and DEFENDANT #29 and additional couriers from North Carolina and Virginia to transport cigarettes to New York. Your affiants have followed a number of couriers, including DEFENDANT #8, DEFENDANT #9, DEFENDANT #12, DEFENDANT #13, DEFENDANT #16, DEFENDANT #18, DEFENDANT #22, DEFENDANT #23. DEFENDANT #29, DEFENDANT #30, and DEFENDANT #31, from the Eastern District of North Carolina across the North Carolina state line into Virginia after observing them load cigarettes from the SUBJECT PREMISES C, SUBJECT PREMISES L, and SUBJECT PREMISES N. Your affiants provided information to Henrico County Police in Virginia that led to traffic stops involving DEFENDANT #9, DEFENDANT #12, DEFENDANT #18, DEFENDANT #22, and DEFENDANT #23 in which law enforcement seized bulk cigarette shipments of over 500 cartons of cigarettes well in excess of 10,000 cigarettes.    After a series of traffic stops and arrests in Virginia, some of the DEFENDANTS shifted their transportation route to travel from Fayetteville, North Carolina through Greensboro, North Carolina to U.S. Highway 29 into Virginia. Your affiants noted that this route added two hours to the trip to northern Virginia. Based on your affiants' training and experience, this was done to avoid law enforcement on I-95, in the vicinity of the Richmond, Virginia, area. This has been a consistent

11

SK

pattern throughout the fall of 2018, and the winter, spring and into the summer of 2019 with almost daily pickups, deliveries and transportation of cigarettes northward and out of the state of North Carolina. Your affiants have physically followed DEFENDANT #8, DEFENDANT #13, and DEFENDANT #16 with loads of cigarettes to Bailey's Crossing Apartments in Arlington, Virginia, and documented DEFENDANT #13 and DEFENDANT #16 transferring cigarettes to another vehicle that traveled to Syracuse, New York. DEFENDANT #16 was documented by New York State Tax investigators unloading the cigarettes at a storage business in Syracuse the following morning. Additionally, your affiants have utilized court ordered electronic tracking devices installed on courier vehicles operated by DEFENDANT #8 and DEFENDANT #13 to document a pattern of stops at Bailey's Crossing apartments in Arlington Virginia. Frequently, the courier vehicles operated by DEFENDANT #8 and DEFENDANT #13 returned to Fayetteville, North Carolina after the brief stop at the apartment complex.

35.     Your affiants have conducted extensive surveillance throughout this investigation utilizing video cameras and still photography to document the organization's criminal activities. Your affiants have observed and noted that DEFENDANT #3, DEFENDANT #5 and DEFENDANT #10 have continuously transported cigarettes from SUBJECT PREMISES C and storefronts and deliver them to other clandestine locations, to include storage units that are currently not being used, and or met other DEFENDANTS to off load these cigarettes from one vehicle to another.

36.     Your affiants have observed and documented DEFENDANT #6 and DEFENDANT #7 meeting with DEFENDANT #8 and/or DEFENDANT #13 prior to making purchases of cigarettes from DEFENDANT #1 and DEFENDANT #2. Your affiants and members of the CCSO OCU have witnessed DEFENDANT #8 and/or DEFENDANT #13 deliver large quantities of bulk U.S currency to DEFENDANT #6 and DEFENDANT #7 at various business parking lots. After DEFENDANT #6 and DEFENDANT #7 received the money they traveled directly to DEFENDANT #2 to purchase the cigarettes.

37.     Your affiants noted and documented DEFENDANT #6 going to DEFENDANT #2 and purchasing large quantities of cigarettes on an almost daily basis. DEFENDANT #6, and DEFENDANT #7, became the primary buyers of the cigarettes for the cigarette trafficking organization. Your affiants have documented over $3 million dollars of cigarette purchases and transactions that DEFENDANT #6, and DEFENDANT #7 made from DEFENDANT #1 and DEFENDANT #2 since October of 2018.

12

Sk

38.     Throughout this investigation your affiants noted that DEFENDANT #6 and other DEFENDANTS traveled between SUBJECT PREMISES A, SUBJECT PREMISES B, SUBJECT PREMISES C, SUBJECT PREMISES D, and SUBJECT PREMISES E consistently purchasing, unloading, storing, repackaging and re loading large quantities of cigarettes and often times moving back and forth between the SUBJECT PREMISES A, SUBJECT PREMISES B, SUBJECT PREMISES C, SUBJECT PREMISES D, and SUBJECT PREMISES E throughout the day. Further, throughout the investigation, your affiants have documented DEFENDANT #6 traveling from SUBJECT PREMISES A, SUBJECT PREMISES B, SUBJECT PREMISES C, SUBJECT PREMISES D, and SUBJECT PREMISES E to meetings for "money drops", purchasing cigarettes to be trafficked, and meeting with other DEFENDANTS. DEFENDANT #6 has throughout the investigation represented that the purchases of the cigarettes were for resale in SUBJECT PREMISES B and SUBJECT PREMISES D along with a number of other stores, which DEFENDANT #6 does not appear to frequent or even be associated with. DEFENDANT #6 has on numerous occasions met with DEFENDANT #7 and DEFENDANT #8 at SUBJECT PREMISES A. Your affiants have documented cases of cigarettes being transferred from DEFENDANT #6's truck to other vehicles on a number of occasions in the front yard of SUBJECT PREMISES A. DEFENDANT #6 consistently used SUBJECT PREMISES A, SUBJECT PREMISES B, SUBJECT PREMISES C, SUBJECT PREMISES D, and SUBJECT PREMISES E to carry out his portion of the illegal activity. DEFENDANT #6 traveled approximately between SUBJECT PREMISES A, SUBJECT PREMISES B, SUBJECT PREMISES C, SUBJECT PREMISES D, and SUBJECT PREMISES E in December 2018, sixteen (16) times; twenty six (26) times in January 2019; fifteen times (15) in February 2019; twenty two (22) times in March 2019; thirty one (31) times in May of 2019, and over twenty (20) times in June of 2019. These trips between SUBJECT PREMISES A, SUBJECT PREMISES B, SUBJECT PREMISES C, SUBJECT PREMISES D, and SUBJECT PREMISES E were in conjunction with money pickups with some other DEFENDANTS and/or purchasing large quantities of cigarettes with this US currency.

39.     Since December 11, 2018 through the date of this affidavit, your affiants using physical and technical surveillance documented DEFENDANT #6 making purchases of cigarettes from DEFENDANT #1 and DEFENDANT #2 then driving directly to SUBJECT PREMISES C which is a storage facility. SUBJECT PREMISES C is a storage facility named Manchester Mini Storage. Your affiants were able to determine the storage unit number 14-17 is rented by DEFENDANT #8. SUBJECT PREMISES C has access on both sides of the building and has two separate doors. One door has the #14 and the other has #17. While having two doors and numbers SUBJECT PREMISES C is rented by DEFENDANT #8. Your affiants have extensively documented almost daily cigarette drop offs by DEFENDANT #6 and from other members of the cigarette trafficking organization throughout this

SK

investigation. Once these cigarettes are inside of SUBJECT PREMISES C, other members such as DEFENDANT #8 and DEFENDANT #13 would then repackage these cigarettes into black plastic trash bags prior to reloading into transport vehicles. Your affiants have observed and documented these vehicles leave from SUBJECT PREMISES C and drive north either using U.S. Highway 29 through Virginia or I-95 through Virginia. Your affiants have utilized physical surveillance documenting these vehicles did in fact leave the state of North Carolina and drive to northern Virginia and/or New York.

40.     Surveillance by your affiants have also documented DEFENDANT #8, DEFENDANT #13, and DEFENDANT #29 using an apartment located at SUBJECT PREMISES I as a base of operation where they meet and sleep in between trips from Fayetteville, North Carolina, to northern Virginia and/or New York, New York. Your affiants have observed DEFENDANT #8, DEFENDANT #13, and DEFENDANT #29 return from smuggling trips to SUBJECT PREMISES I. Your affiants have observed DEFENDANT #8, DEFENDANT #13, and DEFENDANT #29 leave SUBJECT PREMISES I to make pickups of cigarettes to be transported out of state. Your affiants have noted DEFENDANT #8, DEFENDANT #13, and DEFENDANT #29 often are carrying book bags or plastic bags to and from SUBJECT PREMISES I. Additionally, DEFENDANT #8 and DEFENDANT #13 have been observed making "money drops" in which they left SUBJECT PREMISES I and met with DEFENDANT #6 to provide the funds for DEFENDANT #6 to make large cigarettes purchases from DEFENDANT #1 and DEFENDANT #2. Since February 20, 2019 to the date of this affidavit, your affiants have documented some combination of DEFENDANT #8, DEFENDANT #13 and DEFENDANT #29 utilizing SUBJECT PREMISES I for purposes of furthering the criminal enterprise.

41.     Your affiants identified DEFENDANT #5 as a supplier of cigarettes to the cigarette trafficking organization. Your affiants have observed and documented DEFENDANT #5 transporting cigarettes from tobacco stores to SUBJECT PREMISES C to be trafficked out of the state of North Carolina by DEFENDANT #8 and DEFENDANT #13. Your affiants additionally observed DEFENDANT #5 on a number of occasions meet with some of the DEFENDANTS in parking lots or at storage facilities rented by members of the conspiracy, including SUBJECT PREMISES C, for housing cigarettes. DEFENDANT #5 resides at SUBJECT PREMISES F. Your affiants used physical and electronic tracking tools to document DEFENDANT #5 leaving SUBJECT PREMISES F and deliver cigarettes to storage units, including SUBJECT PREMISES C, where surveillance has indicated large quantities were being compiled for trafficking into New York. Surveillance also documented often times DEFENDANT #5 arrives at these locations, including SUBJECT PREMISES C, alone and using a key to unlock the door and drop off cases of cigarettes, which would be picked up by DEFENDANT #8 and DEFENDANT #13

14

SK

for transport to New York. Your affiants documented on multiple occasions DEFENDANT #5 would leave SUBJECT PREMISES F and meet DEFENDANT #8 in the parking lot of First Bank on Village Drive in Fayetteville, North Carolina. The two would exchange a black in color plastic bag which is commonly used within this trafficking organization to transport money. Your affiants have been advised by CSI #2 that the organization typically delivers the money in black plastic bags to DEFENDANT #2 when making purchases. These meetings with DEFENDANT #8 would take place prior to DEFENDANT #8 making a daily run north trafficking cigarettes. Your affiants have observed and documented on multiple occasions DEFENDANT #5 travel from First Bank on Village Drive to BB&T on Boone Trail, Fayetteville, North Carolina, approximately 200 yards away and then to Wells Fargo Bank located just down Owen Drive on Walter Reed Road. DEFENDANT #5 has been surveilled making these trips to three separate banks within minutes of each other and often times carrying a black in color plastic bag in hand into the bank or a stack of U.S. currency which was visible to your affiants. During the time frame of February and March 2019 while your affiants were monitoring DEFENDANT #5's movement with a GPS device it was observed that DEFENDANT #5 traveled from SUBJECT PREMISES F to multiple banks, money drops with coconspirators and/or to SUBJECT PREMISES C six (6) separate occasions. DEFENDANT #5 has been a steady supplier of cigarettes and often times DEFENDANT #5 drives directly from SUBJECT PREMISES F to clandestine locations, including SUBJECT PREMISES C, to drop off these loads of cigarettes.

42.     Your affiants have observed and documented DEFENDANT #3 who resides at SUBJECT PREMISES G transporting large quantities of cigarettes to storage units, including SUBJECT PREMISES C, throughout Cumberland County. These storage units, including SUBJECT PREMISES C, have been and are rented by DEFENDANT #8. Many times DEFENDANT #3 would deliver cigarettes after driving from SUBJECT PREMISES G to the storage units, including SUBJECT PREMISES C, and then back to SUBJECT PREMISES G indicating DEFENDANT #3's home, SUBJECT PREMISES G, is being used to house cigarettes or documents as to where the cigarettes may have come from. DEFENDANT #3 has on numerous occasions driven from SUBJECT PREMISES G to various retail tobacco stores he owns or is associated with and picks up several cases of cigarettes at each location and carries them out of the back door. DEFENDANT #3 then delivers them to a clandestine storage facility or meets coconspirators behind shopping centers and offloads the cigarettes from his van to their transport vehicle. DEFENDANT #3 has continuously through this investigation used SUBJECT PREMISES G or vehicle to house or transport cigarettes. Your affiants on more than 6 occasions throughout this investigation observed DEFENDANT #3's continued criminal activity and meeting with and delivering contraband cigarettes to coconspirators as well as to clandestine storage facilities.

15

SK

43.     Your affiants identified DEFENDANT #10 as a supplier and transporter of cigarettes for the cigarette trafficking organization. DEFENDANT #10 has supplied and/or picked up cigarettes at various storage facilities, including SUBJECT PREMISES C, during the course of the investigation. Surveillance has observed DEFENDANT #10 using his vehicle and rental vehicles to transport cigarettes that were being supplied to the trafficking organization. Your affiants utilized physical and electronic surveillance following and documented DEFENDANT #10 traveling from storage locations, SUBJECT PREMISES C, to his residence which is located at SUBJECT PREMISES H.   Your affiants received information from CSI #1 that DEFENDANT #10 had been the subject of a cigarette smuggling investigation in New York. CSI #1 reported that DEFENDANT #10 had been linked to renting a number of vehicles that had been identified as couriers by New York law enforcement.

44.     Your affiants identified DEFENDANT #1 and DEFENDANT #2 as a supplier of cigarettes for the smuggling organization. DEFENDANT #1 resides at and owns DEFENDANT #2 which is located at SUBJECT PREMISES E.  Your affiants have evidence to believe DEFENDANT #1 has structured cigarette purchases of the smuggling organization to hide and conceal the cigarette trafficking organizations criminal activity by listing single purchases of often time 1000's of cartons of cigarettes as being purchased by multiple stores or buyers.  DEFENDANT #1 has aided and assisted the smuggling organization by funneling their illegal money through his business to further the criminal organizations smuggling activity. CSI #2 reported that DEFENDANT #1 had identified the smuggling organization as the "Yemanese Mafia" in conversation and explained to the source that the smuggling organization transported the cigarettes up north to be sold on the black market. Your affiants know based on information from CSI #2 that DEFENDANT #2 maintains records and documents of sales and transactions with in the building located at SUBJECT PREMISES E. Your affiants learned from CSI #2 that DEFENDANT #6 AND DEFENDANT #7 paid for the purchases of cigarettes in large sums of U.S. currency which are handed over to DEFENDANT #1 or his employees in black plastic trash bags which is not industry standard for businesses conducting financial transactions.  Surveillance has documented DEFENDANT #1 helping load these cases of cigarettes into rental vehicles, trucks and vans as well as watching the loading. Many times DEFENDANT #1 stands by after the loading and watches these loads being concealed with black blankets or quilts before the buyers leave the property.  DEFENDANT #1, and by his direction his employees, make large cash deposits into multiple accounts at Crestcom Bank and Capital Bank/ First Bank of Tennessee on a daily basis.

45.     Your affiants identified DEFENDANT #19 as the financier, organizer, buyer and distributor of contraband cigarettes.  DEFENDANT #19 resides at

16

Sk

SUBJECT PREMISES J. Since October of 2018 your affiants have documented DEFENDANT #19 purchasing and distributing thousands of cartons of cigarettes on multiple occasions. DEFENDANT #19 continuously travels from Robeson County, North Carolina northward to include Raleigh and Smithfield, North Carolina, making large purchases of cigarettes and depositing them in clandestine storage locations such as business sites, including SUBJECT PREMISES L, residences, including SUBJECT PREMISES M, and private garages, including SUBJECT PREMISES N. Your affiants have also surveilled DEFENDANT #19 after making purchases of cigarettes to locations in which a vehicle was parked stationary with no driver inside and DEFENDANT #19 would access the trunk of the car or the bed of a covered pickup truck and unload cases of cigarettes to then be loaded into the vehicle DEFENDANT #19 was driving. DEFENDANT #19 would then take all these cigarettes and deliver them to clandestine storage locations, including SUBJECT PREMISES L, SUBJECT PREMISES M, and SUBJECT PREMISES N where drivers would pick these loads up and take them north and out of the state of North Carolina. Your affiants documented DEFENDANT #24 and DEFENDANT #29 traveling to SUBJECT PREMISES J in their vehicles. DEFENDANT #24 traveled to SUBJECT PREMISES J after making a large purchase of cigarettes in Fayetteville, North Carolina. DEFENDANT #29 traveled to SUBJECT PREMISES J after driving back from New York through the night. Your affiants are aware of a March 19, 2019, bulk currency seizure where DEFENDANT #19 was stopped on I-95 in Cumberland County by deputies and found to have $32,200.00 in U.S. currency in the vehicle that was believed to be proceeds from cigarettes trafficking. As a result of a consensual interview with DEFENDANT #19, your affiants identified bank accounts belonging DEFENDANT #19. On March 20, 2019, DEFENDANT #19 was interviewed by law enforcement and produced bank statements indicating accounts were used for his business Smokeville Tobacco located SUBJECT PREMISES L. The account was in the name of Al-Talal Holdings, Inc., which DEFENDANT #19 was the owner. During the interview, DEFENDANT #19 made a number of false statements about the amounts of cigarettes purchased and his method of payment for purchasing cigarettes. The North Carolina Department of the Secretary of State has SUBJECT PREMISES J as a listed address for Al-Talal Holdings, Inc.

46.     During the course of this investigation, your affiants have documented DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #27 and DEFENDANT #28 utilizing or frequenting daily SUBJECT PREMISES K. DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #27 and DEFENDANT #28 are all purchasers and transporters of contraband cigarettes being smuggled form North Carolina to Virginia and New York.     DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #27 and DEFENDANT #28 have made almost daily trips as a group to Sam's Club in Fayetteville, North Carolina, USA Wholesale, and/or SUBJECT PREMISES E. Your affiants have

17

SK

documented DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #27 and DEFENDANT #28 leaving SUBJECT PREMISES K and driving directly to locations, including SUBJECT PREMISES E, to purchase large quantities of cigarette with U.S. currency. Your affiant have also observed individuals leave SUBJECT PREMISES K and drive to SUBJECT PREMISES L and pick up black in color trash bags containing U.S. currency. DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #27 and DEFENDANT #28 would then drive directly to SUBJECT PREMISES E and purchase cigarettes from DEFENDANT #1 and DEFENDANT #2. Your affiants were able to confirm this information through surveillance and information provided by CSI #2 as to the U.S. currency coming from the DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #27 and DEFENDANT #28 as well as being delivered in black in color plastic bags to DEFENDANT #1 and DEFENDANT #2. DEFENDANT #20, DEFENDANT #24, DEFENDANT #25, DEFENDANT #27 and DEFENDANT #28 working in concert operate daily from SUBJECT PREMISES K to facilitate their illegal activity.

47.    Your affiants have extensive surveillance and documentation of members of the conspiracy utilizing SUBJECT PREMISES L to house and distribute cigarettes. SUBJECT PREMISES L is owed by Speedway Imports, Inc. which is owned by DEFENDANT #19's brother. SUBJECT PREMISES L houses three business which are all joined. These business have access to a bay area or garage area which is located in the back right hand side of the building. Your affiants have observed co-conspirators access the front doors of all three businesses. Two of the store front have signs and lights as if there are open for business. The store front to the far left has a sign above the doorway naming that business as "Tobacco N Vape". The store in the middle has a sign above the door naming this store "Lumberton Furniture Gallery". Your affiants have documented members of the conspiracy arriving at the garage door to deliver large quantities of cigarettes. On many occasions if the garage door is down the coconspirators will park their vehicle in front of the garage door and walk around to the front of the building. The coconspirators will then open the garage door from the inside then offload these cigarette into the building. The cigarettes were then consolidated after several more deliveries from the organization are made, and eventually picked up for transport out of the state of North Carolina. Your affiants have further documented DEFENDANT #24 drive from SUBJECT PREMISES K and walk into the business on the far left of SUBJECT PREMISES L. A few moments later, DEFENDANT #24 walked out of the "Tobacco N Vape" store at SUBJECT PREMISES L holding a black in color plastic bag and climb into the van DEFENDANT #24 was riding in. The van then drove directly to SUBJECT PREMISES E and purchased a large quantity of cigarettes from DEFENDANT #1 and DEFENDANT #2. CSI #2 confirmed DEFENDANT #24 paid

18

SK

for the cigarettes in U.S. currency and had taken the money out of a black in color plastic bag.

48.     Your affiants have observed and documented DEFENDANT #17, DEFENDANT #19, and DEFENDANT #26 utilize SUBJECT PREMISES M to house and distribute contraband cigarettes. DEFENDANT #26 is the son of DEFENDANT #17. DEFENDANT #17 and DEFENDANT #26 both live at SUBJECT PREMISES M. DEFENDANT #17 and DEFENDANT #26 have on many occasions in the past months traveled between SUBJECT PREMISES M and SUBJECT PREMISES N almost daily moving cigarettes between SUBJECT PREMISES M and SUBJECT PREMISES N and awaiting transport vehicles to transport and traffic shipments of cigarettes into Virginia and New York.    Your affiants have also documented shipments from SUBJECT PREMISES E be transported directly to SUBJECT PREMISES M in a white van by DEFENDANT #26. Your affiants have also documented DEFENDANT #19 and DEFENDANT #26 moving cigarettes between SUBJECT PREMISES L and SUBJECT PREMISES M and consolidating these cigarettes for distribution north.

49.     Your affiants have through extensive surveillance identified SUBJECT PREMISES N as a clandestine storage location for contraband cigarettes.  This is a private storage facility. SUBJECT PREMISES N is rented and controlled by DEFENDANT #17. DEFENDANT #17 also has remote access to this storage garage. Your affiants have documented loads of contraband cigarettes being delivered to SUBJECT PREMISES N as well as vehicles arriving and loading up these cigarettes to be transported north of the state of North Carolina.  Your affiants have observed large quantities of cigarettes being purchased by coconspirators and being driven to SUBJECT PREMISES N where they were delivered and redistributed for smuggling north to Virginia and New York.

### FINANCIAL INVESTIGATION

#### Analysis of Bank Records

50.     Your affiants received information from CSI #2 related to DEFENDANT #1 and DEFENDANT #2 use of the banking system to further the conspiracy.  CSI #2 explained that members of the conspiracy purchase cigarettes from DEFENDANT #2 primarily with cash.  Your affiants know based on their training and experience, and learned through this investigation, that the cash being used to purchase the cigarettes is proceeds from prior illicit cigarette sales that is then reinvested into the criminal enterprise.   CSI #2 explained that DEFENDANT #2's employees deposit the cash proceeds into SUBJECT ACCOUNT 5101. DEFENDANT #2's employees then write a check from SUBJECT ACCOUNT 5101, to DEFENDANT #2.  The check is

19

deposited into SUBJECT ACCOUNT 2645. DEFENDANT #1 and DEFENDANT #2 then pay the cigarette distributors for the cigarettes being sold to DEFENDANT #2. CSI #2 stated that SUBJECT ACCOUNT 5101 was set up to run cash deposits through to avoid "banking fees for cash deposits" at Capital Bank, and prior to the creation of that account DEFENDANT #1 and DEFENDANT #2 utilized SUBJECT ACCOUNT 2645 to further the conspiracy.

51.     Your affiants reviewed banking records for SUBJECT ACCOUNT 5101. Your affiants located the following series of checks from SUBJECT ACCOUNT 5101 that illustrate and corroborate the information provided by CSI #2.

| Pay to the order of | Date | Amount | Endorsed |
|---|---|---|---|
| DEFENDANT #2 | 03/28/2019 | $96,817.33 | For Deposit Only |
| DEFENDANT #2 | 03/29/2019 | $62,007.28 | For Deposit Only |
| DEFENDANT #2 | 04/02/2019 | $167,995.06 | No Endorsement |
| DEFENDANT #2 | 04/03/2019 | $158675.00 | For Deposit Only |
| DEFENDANT #2 | 04/04/2019 | $113,061.00 | For Deposit Only |
| DEFENDANT #2 | 04/05/2019 | $62,333.10 | For Deposit Only |
| DEFENDANT #2 | 04/08/2019 | $60,093.15 | For Deposit Only |
| DEFENDANT #2 | 04/09/2019 | $149,756.06 | For Deposit Only |
| DEFENDANT #2 | 04/10/2019 | $137,685.00 | For Deposit Only |

52.     SUBJECT ACCOUNT 5101 statement for March of 2019 indicated that the account received $159,849.02 in credits and $95,080.25 in debits. SUBJECT ACCOUNT 5101 statement for April of 2019 indicated that the account received $2,963,067.77 credits and $2,768,235.72 in debits. SUBJECT ACCOUNT 5101 statement for May of 2019 indicated that the account received $3,031,021.45 credits and $3,159,034.28 in debits.

53.     SUBJECT ACCOUNT 2645 statement for January of 2019 indicated that the account received $1,659,971.53 in credits and $1,838,110.91 in debits. SUBJECT ACCOUNT 2645 statement for February of 2019 indicated that the

SK

account received $1,587,706.74 in credits and $1,504,984.86 in debits. SUBJECT ACCOUNT 2645 statement for March of 2019 indicated that the account received $2,156,793.15 in credits and $2,184,591.10 in debits.

54.    Your affiants have conducted extensive surveillance of Smokeville Outlet in Lumberton, North Carolina, and documented that DEFENDANT #19 is using the business building to consolidate cigarettes for interstate shipment. A network of buyers have been observed purchasing cigarettes at DEFENDANT #2 and driving to the Smokeville Outlet at SUBJECT PREMISES L where the cigarettes are being consolidated. Shortly after the buyers depart, individuals that have been identified as transporters arrive and pick up cigarettes and drive them to Virginia and New York.

55.    From March 14, 2019, to May 30, 2019, 56 checks totaling $6,490,967.73 were issued from SUBJECT ACCOUNT 5101 to DEFENDANT #2 and deposited into SUBJECT ACCOUNT 2645.

56.    In March 2019, 4 checks totaling $917,324.24 were issued from SUBJECT ACCOUNT 2645 to SouthCo, Inc., a tobacco wholesaler. SouthCo, Inc. supplied cigarettes to DEFENDANT #1 and DEFENDANT #2 that were sold to the cigarette trafficking organization.

57.    In March 2019, 24 checks totaling $1,214,323.68 were issued from SUBJECT ACCOUNT 2645 to Atlantic Dominion Distributors. Atlantic Dominion Distributors supplied cigarettes to DEFENDANT #1 and DEFENDANT #2 that were sold to other members of the conspiracy.

<u>Summary of Probable Cause for Seizure Warrants</u>

58.    For purposes of this seizure warrant, your affiants have probable cause to believe the aforementioned assets are subject to forfeiture pursuant to 18 U.S.C. § 981 based on the following information.

59.    While running DEFENDANT #2, DEFENDANT #1 sold cigarettes to other members of the conspiracy who were trafficking cigarettes from North Carolina to New York. DEFENDANT #1 accepted cash payments for trafficked cigarettes. The cash was deposited into SUBJECT ACCOUNT 5101 and then transferred to SUBJECT ACCOUNT 2645. Funds from both SUBJECT ACCOUNT 5101 and SUBJECT ACCOUNT 2645 were used to continue purchasing cigarettes for the ongoing conspiracy.

60.     The organization utilized members of the conspiracy to purchase cigarettes from DEFENDANT #1 and DEFENDANT #2. The co-conspirators would place daily orders with DEFENDANT #2. DEFENDANT #1 and DEFENDANT #2 created an invoicing system that credited purchases of cigarettes to a variety of stores when actually members of the conspiracy traveled to DEFENDANT #2 and purchased the cigarettes for interstate transportation without the payment of applicable state taxes.

61.     Members of the conspiracy often covered the loads of cigarettes with blankets and sheets to secret the load while at the loading dock of DEFENDANT #2 in the presence of DEFENDANT #2 employees and DEFENDANT #1.

62.     On multiple occasions, DEFENDANT #1 and DEFENDANT #2 allowed DEFENDANT #6 to drive a DEFENDANT #2 van to transport loads of cigarettes to storage facilities for interstate shipments when the loads were too large to transport in pickup trucks.

63.     Since October of 2018, DEFENDANT #19 has operated a group of co-conspirators that have purchased cigarettes in North Carolina for transportation to New York. DEFENDANT #19 and DEFENDANT #17 rented warehouse space at SUBJECT PREMISES N. SUBJECT PREMISES N was used consolidate shipments of cigarettes for interstate transportation.

## CONCLUSION

64.     Based on the above information, there is probable cause to believe that the SUBJECT OFFENSES have been committed, and that the property and items listed in Attachment Q are to be located at the SUBJECT LOCATIONS.

65.     Based upon the foregoing, your affiants respectfully request that this Court issue warrants to search the SUBJECT LOCATIONS each of which are more particularly described in Attachments A-N and to authorize the seizure of the items described in Attachment Q.

66.     Based on the above information, there is probable cause to believe that the SUBJECT ACCOUNTS described in Attachments O-P are forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1) as property involved in violations of 18 U.S.C. §§ 1956 and 1957 (i.e. money laundering), and 18 U.S.C. § 981(a)(1)(C) as property which constitutes or is derived from proceeds traceable to a specified unlawful activity or conspiracy to commit such an offense, to wit contraband cigarette trafficking in violation of 18 U.S.C. § 2342.

22

SK

67. Your affiants respectfully submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture, because funds held in bank accounts can be easily liquidated or transferred. Based upon the foregoing, your affiants respectfully request that this Court issue seizure warrants for all funds held in the SUBJECT ACCOUNTS listed in Attachments O-P.

Further your affiants sayeth not.

Bryan T. Moultis
Special Agent
Homeland Security Investigations

David F. Borresen
Senior Sargent, Detective
Cumberland County Sheriff's Office

On this __12__ day of July 2019, Special Agent Bryan T. Moultis and Senior Sargent David F. Borresen, appeared before me via reliable electronic means, were placed under oath, and attested to the contents of this Affidavit.

JAMES E. GATES
United States Magistrate Judge

23

Sk

# ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

109 Ashton Place, Spring Lake, North Carolina 28390

SUBJECT PREMISES A is located in Spring Lake, North Carolina. SUBJECT PREMISES A is a single story dwelling with light green in color siding and dark green in color shutters, tan trim and a white in color door. The dwelling is a single-family residence and is located in the west end of the circle on Ashton Place.



## ATTACHMENT B

## DESCRIPTION OF PREMISES TO BE SEARCHED

123 N Main Street, Spring Lake, North Carolina 28390

SUBJECT PREMISES B is located in Spring Lake, North Carolina. SUBJECT PREMISES B is a brick single story business located on the far right hand side of a block of businesses and has the numbers "123" affixed above the front door of the business.



# ATTACHMENT C

## DESCRIPTION OF PREMISES TO BE SEARCHED

165 W Manchester Rd., Unit 14-17, Spring Lake, North Carolina 28390

SUBJECT PREMISES C is located in Spring Lake, North Carolina. SUBJECT PREMISES C is a storage unit located in Manchester Mini Storage on the southern side of Manchester Road near the intersection of N. Bragg Blvd. The unit is tan in color with blue in color doors. The unit is a drive through unit with a door on either end. Above one of the doors is the number "14" and the other is "17".



## ATTACHMENT D

## DESCRIPTION OF PREMISES TO BE SEARCHED

1111 N. Bragg Blvd, Suite 90, Spring Lake, North Carolina 28390

SUBJECT PREMISES D is located in Spring Lake, North Carolina. SUBJECT PREMISES D is a single story business located in the southeast corner of a shopping center and has the number "90" above the door. The building is a white in color cinder block building.



# ATTACHMENT E

## DESCRIPTION OF PREMISES TO BE SEARCHED

231 Williams Street, Fayetteville, North Carolina 28301

SUBJECT PREMISES E is located in Fayetteville, North Carolina. SUBJECT PREMISES E is a black, grey and yellow in color building with the name "Freeco." On the front wall. The building is a warehouse style building and is located at the intersection of Williams Street and Rankin Street in Fayetteville, North Carolina.



## ATTACHMENT F

## DESCRIPTION OF PREMISES TO BE SEARCHED

3005 Lambrusco Place, Fayetteville, North Carolina 28306

SUBJECT PREMISES F is located in Fayetteville, North Carolina. SUBJECT PREMISES F is a brick in color two-story single family dwelling with black in color shutters and white in color trim. The residence has the numbers on the porch above the door of "3005" and is located at the intersection of Lambrusco Place and Bardolino Drive.



## ATTACHMENT G

## DESCRIPTION OF PREMISES TO BE SEARCHED

3605 Heather Brook, Fayetteville, North Carolina 28306

SUBJECT PREMISES G is located in Fayetteville, North Carolina. SUBJECT PREMISES G is a two story single family dwelling with tan in color siding and white in color trim. SUBJECT PREMISES G has the numbers "3605" to the left hand side of the front door. SUBJECT PREMISES G is located on the southwest corner of the intersection of Heatherbrook Drive and Sunchase Drive.



## ATTACHMENT H

## DESCRIPTION OF PREMISES TO BE SEARCHED

4207 Cinder Lane, Fayetteville, North Carolina 28312

SUBJECT PREMISES H is located in Fayetteville, North Carolina, which is east of Fayetteville, North Carolina. SUBJECT PREMISES H is a two story single family dwelling with tan in color siding, black in color shutters and white in color trim. The numbers 4207 are affixed to the right hand side of the front door. The house is due east of the intersection of Cinder Lane and Pleasantburg Drive.



07/09/2019 10:19

## ATTACHMENT I

## DESCRIPTION OF PREMISES TO BE SEARCHED

3124 B Turtle Point Drive, Fayetteville, North Carolina 28304

SUBJECT PREMISES I is located in Fayetteville, North Carolina. SUBJECT PREMISES I is an apartment located in the Village Gate Apartment complex. The building has the number "3124" on the front and the letter "B" on the door of the apartment. SUBJECT PREMISES I is in the eastern corner of the apartment complex and faces Village Drive in Fayetteville, NC. The building is light grey in color with tan in color trim.



## ATTACHMENT J

## DESCRIPTION OF PREMISES TO BE SEARCHED

46 Alyssa Court, Lumberton, North Carolina 28360

SUBJECT PREMISES J is located in Lumberton, North Carolina. SUBJECT PREMISES J is a two story single family dwelling, brick in color with white in color trim. SUBJECT PREMISES J has the number "46" above on the front porch above the door. SUBJECT PREMISES J is located on the far east end of Alyssa Court which is a dead end street.



# ATTACHMENT K

## DESCRIPTION OF PREMISES TO BE SEARCHED

4811 Pinedale Blvd., Lumberton, North Carolina 28358

SUBJECT PREMISES K is located in Lumberton, North Carolina. SUBJECT PREMISES K is a two story single-family dwelling and is the far right hand unit in a building of townhomes. SUBJECT PREMISES K is yellow in color with white in color trim and blue in color shutters. SUBJECT PREMISES K has the numbers "4811" affixed to the front door. SUBJECT PREMISES K is located on the south side of Pinedale Blvd.



## ATTACHMENT L

## DESCRIPTION OF PREMISES TO BE SEARCHED

2306 E. Elizabethtown Road, Lumberton, North Carolina 28358

SUBJECT PREMISES L is located in Lumberton, North Carolina. SUBJECT PREMISES L is a white in color metal building with red in color awning on the front of the building. SUBJECT PREMISES L has a large sign above the doors which states "Lumberton Furniture Gallery". SUBJECT PREMISES L is located on the south side of E. Elizabethtown Rd and to the east of Hwy 211. SUBJECT PREMISES L is a business location.



# ATTACHMENT M

## DESCRIPTION OF PREMISES TO BE SEARCHED

39 White Oak Drive, Smithfield, North Carolina 27577

SUBJECT PREMISES M is located in Smithfield, North Carolina. SUBJECT PREMISES M is a three story single-family dwelling with brick and white in color exterior. SUBJECT PREMISES M has black in color shutters and is located on the south side of White Oak Drive.



## ATTACHMENT N

### DESCRIPTION OF PREMISES TO BE SEARCHED

1041 Highway 701 S, Four Oaks, North Carolina 27524

SUBJECT PREMISES N is located in Four Oaks, North Carolina. SUBJECT PREMISES N is a private garage located at 1041 Highway 701 and has a yellow in color exterior and white in color trim. SUBJECT PREMISES N consist exclusively of the right side garage bay looking from the front of the building. SUBJECT PREMISES N is on the north side of US Highway 701 S.



## ATTACHMENT O

## DESCRIPTION OF ITEMS TO BE SEIZED

The balance of all funds held in CresCom Bank account number 4300325101 in the name of Freeco, Inc.

## ATTACHMENT P

## DESCRIPTION OF ITEMS TO BE SEIZED

The balance of all funds held in Capital Bank account number 802152645 in the name of Freeco, Inc.

## ATTACHMENT Q

## PARTICULAR ITEMS TO BE SEARCHED FOR AND SEIZED

This warrant authorizes (i) the search of SUBJECT PREMISES A-N as described in Attachments A-N for only the following, and (ii) authorizes the seizure of the items listed below only to the extent they constitute the following:

a. Evidence of violations of the SUBJECT OFFENSES as specified below:

1. 18 U.S.C. § 2342(a) (cigarette trafficking);
2. 18 U.S.C. § 371 (conspiracy to commit cigarette trafficking);
3. 18 U.S.C. § 1956(a)(1)(A)(i) (money laundering);
4. 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering); and
5. 18 U.S.C. § 1956(h) (conspiracy to commit money laundering)

b. any item constituting contraband due to the SUBJECT OFFENSES, fruits of the SUBJECT OFFENSES, or other items possessed whose possession is illegal due to the SUBJECT OFFENSES; and

c. any property designed for use, intended for use, or used in committing any SUBJECT OFFENSES.

Subject to the foregoing, the items authorized to be seized include the following:

a. documents and/or writings which tend to show ownership of the residence, business and/or occupants thereof; and

b. documents and/or writings indicative of the purchasing, sale, storage, consolidation and shipment of contraband cigarettes; and

c. books, records, receipts, bank statements and records, money drafts, letter of credit, money orders and cashier's receipts, bank checks, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money; and

d. books, records, receipts, notes, ledgers, and other documents relating the purchasing, sale, storage, consolidation and shipment of cigarettes; and

e. United States currency and other financial instruments related to the SUBJECT OFFENSES; and

f. cigarettes; and

g. vehicles owned or operated by DEFENDANTS located at the premises subject to this warrant, including those parked on the street; and

h. documents, records, and/or other evidence that may relate to the aforementioned items but that are in a foreign language and require translation; and

i. other items that are evidence, fruits, or instrumentalities of a violation of the aforementioned specified federal offenses; and

j. any of the aforementioned items relating to companies, both known and unknown, that may be owned or operated by DEFENDANTS, or any other co-conspirator that may be involved in any of the aforementioned violations, and that are stored at any of the premises subject to this warrant; and

k. cellphones, personal computers, laptop computers, handheld computers/organizers, computer files indicating access to hard disks, flash drives and any other electronic media containing evidence of the coordination of the SUBJECT OFFENSES and the amassing, transfer, and laundering of money obtained from the same; and

l. any receipt book or financial record however maintained, and any physical or digital documents or data showing business and personal assets, including, but not limited to: income statements, cash receipt journals, bank statements, deposit slips, canceled and un-canceled checks, check stubs, check registers, tax returns, general journals; writings, however maintained, and things used in the conduct of the SUBJECT OFFENSES; and

m. any handwriting exemplars, and papers, documents and effects tending to show dominion and control over the SUBJECT LOCATIONS, including keys, fingerprints, handwritings, rental or lease agreements, utility records, documents and effects bearing a form of identification such as a person's name, photograph, Social Security number or driver's license number; employee files, tax records, and canceled mail; and to answer incoming phone calls during execution of the warrant; and

n. Any data recorded on surveillance cameras at the location whether in the form of digital or physical images, videos, or audio recordings or stored in any other format on any device; and

o. any telecommunications devices including telephones, answering machines, fax machines, computer modems, cellular phones, pagers, and other telecommunications devices; and

p. all electronic data processing and storage devices, portable hard-drives, computers and computer systems, including, but not limited to; central processing units, computer towers, servers, internal and peripheral storage devices such as fixed disks, internal and external hard drives, floppy disk drives and diskettes, tape drives and tapes, USB flash drives, zip drives, SD cards, optical storage devices, dongles, encryption keys, personal data assistants (PDA's) or other memory storage devices; and any/all peripheral input/output devices such as keyboards, printers, video display monitors, optical readers and related communication devices such as modems, routers, associated telephone sets, speed dialers, and/or other controlling devices, plotters, software to run programs, connecting cables and plugs; peripherals such as joysticks, computer mice, or other input devices, scanners, writing pads, manuals, computer passwords, hot keys, data security devices, connecting switches, telephones and telephone cables, and interface devices; system documentation, operating logs and documentation, software and instructional manuals. Computing or data processing software, stored on any type of medium such as: hard disks, floppy disks, CD-R's, CD-RW's, DVD 's, cassette tapes, or other permanent or transient storage medium; and

q. any records, whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, programmable instruments such as telephones, "electronic calendar\address books," calculators, or any other storage media, together with indicia of use, ownership, possession, or control of such records; and

r. any written or computer communication in printed or stored medium such as e-mail and chat logs whether in active files, deleted files or unallocated space on the hard drive, floppy drive or any data storage media; and

s. any written or computer communication in printed or stored medium such as promotional flyers, internet webpages, or any other form of advertising that describes the operation of the business as held out to public and patrons; and

t. search of all of the above items is for files, data, images, software, operating systems, deleted files, altered files, system configurations, drive and disk configurations, date and time, and unallocated and slack space, for evidence; and

u. with respect to computer systems and electronic data processing and storage devices any items listed above found during the execution of this search warrant, the searching law enforcement officers are authorized to seize and book said computer systems and any items listed above and transfer them to a law enforcement agency location prior to commencing the search of the items.

The searching law enforcement officers are authorized to employ other officers or civilian employees of any law enforcement organization, or outside experts to access, copy and preserve data and determine if the data contains evidence or writings. The searching law enforcement officers and their agents/officers are authorized to read information stored and contained on any and all seized devices or systems. Furthermore, said search may continue beyond the ten-day period beginning upon issuance of this search warrant, to the extent necessary to complete the search on the computer systems and any items listed above; and

v. U.S. currency, financial instruments or other things or negotiable of value and photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, slides, in particular photographs of other suspect(s), of assets. Addresses and or telephone books, rolodex index and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers of other suspect(s), sources of supply, customers, financial institutions, and other individuals or businesses with whom a relationship exists; Indicia of occupancy, residency, rental and or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys; and

w. To search for authority to have the computers/equipment and cellular phone contents to be examined by a qualified forensic examiner/technician to search the computers/equipment seized at the location listed within this application. This will be for identification, seizure and preservation of evidence to include but not limited to illegal video gaming machines, electrical or mechanical. Records of U.S. Currency, land or property deeds or leases, utility bills, or other evidence of ownership or control or dominion of the business and other items used in the operation of the business and photographs or other items to provide identity of the person or persons related to the commission of these alleged crimes.